OPINION
{¶ 1} Vanny Loch, defendant-appellant, appeals the judgment of the Franklin County Court of Common Pleas, wherein the court found him guilty of one count of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32, a second-degree felony; one count of receiving stolen property with a value in excess of $100,000, in violation of R.C. 2913.51, a third-degree felony; 20 counts of receiving stolen property with a value in excess of $500 but less than $5,000, violations of R.C. 2913.51, fifth-degree felonies; and 11 counts of receiving stolen property with a value of less than $500, violations of R.C. 2913.51, first-degree misdemeanors.
 {¶ 2} Appellant owned VIP Pawn Shop ("VIP"), located in Columbus, Ohio, beginning in 1995. Columbus Police Detective Clyde Schulze was assigned to oversee appellant's operations as part of the department's pawnshop unit and to ensure that appellant was complying with Ohio pawnshop regulations. In 1998, Detective Schulze became suspicious of appellant's operations after police officers informed him that appellant had been uncooperative with several burglary investigations. Detective Schulze noticed appellant's outright purchases outnumbered his pawns and saw that a large number of appellant's purchases were brand new items still in sealed boxes. Detective Schulze also noticed a large number of laptop computers and tools that were exclusive to certain retail stores in the Columbus area. Further, Detective Schulze discovered that 85 to 90 percent of the items appellant had listed for sale on the Internet site E-bay were new in-box items.
 {¶ 3} Detective Schulze set up two sales using an undercover officer whose identification identified him on the police "hotlist" as an individual with a criminal background from whom appellant was not permitted to buy goods. Appellant bought a paint sprayer from the undercover officer even though the officer stated that the item "fell off the shelf into my cart." On August 20, 2001, Detective Schulze obtained a search warrant to recover from appellant any new in-box property that was presumed stolen. The police seized over 400 items. Detective Schulze also obtained a second warrant to retrieve construction tools he noticed while executing the first warrant, and he confiscated the tools. After placing all the items in a warehouse, representatives from Home Depot, Delta Marine, Circuit City, Best Buy, H.H. Gregg, Big Bear, and Lowe's identified items they believed were stolen from their stores.
 {¶ 4} On October 12, 2001, appellant was indicted on one count of engaging in a pattern of corrupt activity, one count of receiving stolen property with a value in excess of $100,000, and 113 counts of receiving stolen property with a value in excess of $500 but less than $5,000. A jury trial was held, after which the jury found appellant guilty of one count of engaging in a pattern of corrupt activity, one count of receiving stolen property with a value in excess of $100,000, 20 counts of receiving stolen property with a value in excess of $500 but less than $5,000, and 11 counts of receiving stolen property with a value less than $500. The remaining counts were dismissed by the state. Appellant appeals the judgment of the trial court, asserting the following six assignments of error:
 {¶ 5} "I. The trial court committed plain error in allowing the prosecuting attorney to introduce prejudicial hearsay testimony through a witness, thereby depriving Appellant of his right to a fair trial and his right of confrontation as guaranteed by the Sixth andFourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.
 {¶ 6} "II. The trial court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by overruling Appellant's Crim.R. 29 motion for judgment of acquittal, as the prosecution failed to prove all the elements of the charge of receiving stolen property and engaging in a pattern of corrupt activity.
 {¶ 7} "III. The trial court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by finding Appellant guilty, as the verdict for the charges of engaging in a pattern of corrupt activity and receiving stolen property was against the manifest weight of the evidence.
 {¶ 8} "IV. The prosecuting attorney's remarks during trial and closing arguments constituted prosecutorial misconduct which deprived Appellant of a fair trial in violation of the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution.
 {¶ 9} "V. The failures of Appellant's trial counsel constituted ineffective assistance, thereby depriving Appellant of his rights as guaranteed by the Sixth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution.
 {¶ 10} "VI. The trial court abused its discretion in imposing lengthy, consecutive sentences without making the requisite findings for consecutive sentences pursuant to R.C. 2929.14 and R.C. 2929.19(b)(2)(c), thereby depriving Appellant of due process of law as guaranteed by theFourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution."
 {¶ 11} Appellant argues in his first assignment of error the trial court committed plain error by allowing the prosecuting attorney to introduce prejudicial hearsay testimony through Detective Schulze. On direct examination, Detective Schulze read the search warrant affidavit to the jury, which contained the statements of Detective Schulze. In the affidavit, Detective Schulze indicated that an informant told him that appellant encouraged several people to bring in stolen items still in the box and promised to pay 45 percent of the retail value. When asked on the stand by the prosecutor how he verified this information, Detective Schulze said he verified this information through interviews with Barry Cyrus, Shawn Mercer, and Paula Mercer.
 {¶ 12} Appellant argues that appellant's trial counsel should have objected to this testimony based upon hearsay. He claims that the statements made in the affidavit by Detective Schulze and Cyrus and the Mercers are hearsay. As appellant's trial counsel did not object to this testimony, we must review it under a plain error standard. Plain error is an obvious error that affects a substantial right. State v. Yarbrough,95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 108, citing State v. Keith (1997), 79 Ohio St.3d 514, 518. An alleged error constitutes plain error only if, but for the error, the outcome of the trial clearly would have been different. Yarbrough, at ¶ 139. Plain error should be noticed by the court only "`with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" State v. Barnes (2002), 94 Ohio St.3d 21, 27, quoting State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 13} The Rules of Evidence prohibit the use of hearsay, which is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is admissible only if it meets one of the exceptions enumerated in the Rules of Evidence. Evid.R. 802. However, in the present case, even assuming arguendo that the testimony of Detective Schulze was hearsay, the issue becomes whether appellant was prejudiced by the testimony, as error in admitting hearsay does not justify reversal where it is harmless. State v. Carter (1995),72 Ohio St.3d 545, 550, citing State v. Sage (1987), 31 Ohio St.3d 173.
 {¶ 14} The hearsay appellant complains of was all repeated, in much greater detail, by the in-court testimony of Detective Schulze, Paula Mercer, and Cyrus. Although Shawn Mercer did not testify at trial, Paula Mercer testified as to the activities she observed involving Shawn Mercer, her husband. Further, the informant in the search warrant affidavit was Cyrus, who testified in court. Because appellant had an opportunity to cross-examine Paula Mercer, Detective Schulze, and Cyrus concerning the subject matter of the alleged hearsay, and the jury could assess these witnesses' demeanor as they explained in detail the actions of appellant referred to in the search warrant affidavit, two hearsay risks normally inherent in such statements were not present here. Cf. State v. Keenan (1998), 81 Ohio St.3d 133, 142, citing California v. Green (1970), 399 U.S. 149, 90 S.Ct. 1930 (the admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial). Any improper testimony from Detective Schulze's reading of the affidavit was cumulative of matters already properly before the jury, and appellant was not prejudiced by that testimony. See State v. Tomlinson (1986), 33 Ohio App.3d 278, 281 (any error in the admission of hearsay is generally harmless when the declarant is cross-examined on the same matters and the seemingly erroneous evidence is cumulative in nature).
 {¶ 15} Appellant also argues the prosecutor's statement that the search warrant was submitted to a judge in the municipal court was prejudicial. Appellant argues this statement made the jury believe that a judge had already given such matters contained in the search warrant a "stamp of approval." We find this argument unpersuasive. The prosecutor did not imply at any time that the judge had given a "stamp of approval" to the allegations contained therein. The prosecutor properly indicated that the search warrant had been "submitted," which is a neutral rendering of the truthful facts. See, also, State v. Thornton (Apr. 1, 1999), Cuyahoga App. No. 73232 (prosecutor's references to a judge's approval of the search warrant was not prejudicial). Therefore, appellant's first assignment of error is overruled.
 {¶ 16} Appellant argues in his second assignment of error the trial court erred by overruling his Crim.R. 29 motion for judgment of acquittal with regard to the charges of receiving stolen property and engaging in a pattern of corrupt activity. Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A trial court may not grant an acquittal by authority of Crim.R. 29(A) if the record demonstrates that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt. State v. Wolfe (1988),51 Ohio App.3d 215, 216. In making this determination, all evidence must be construed in a light most favorable to the prosecution. Id. "In essence, sufficiency is a test of adequacy." State v. Thompkins (1997),78 Ohio St.3d 380, 386.
 {¶ 17} R.C. 2913.51(A) provides: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."
 {¶ 18} R.C. 2923.31(E) provides, in pertinent part, that a "pattern of corrupt activity" means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event. Further, at least one of the incidents forming the pattern must constitute a felony.
 {¶ 19} Appellant specifically argues the state failed to offer sufficient evidence of the receiving stolen property charges because it did not prove that the items seized from VIP were stolen and failed to offer sufficient evidence to prove the value of the property. With regard to the first claim, appellant argues the state failed to establish that any of the specific items seized from VIP were actually stolen. Paula Mercer, one of the people who sold items to VIP, testified that she drove Cyrus to VIP perhaps 30 times, sometimes directly from Home Depot or Delta Marine after he had stolen items. She actually went into VIP with Cyrus about five times to show her identification because Cyrus did not have one. Each time she went in, VIP would pay Cyrus cash for the stolen items. She knew the merchandise that Cyrus was selling to VIP was stolen.
 {¶ 20} Cyrus testified that he had been to VIP probably 100 times. He said he would steal paint sprayers, chain saws, generators, and tools from Home Depot, Delta Marine, and Lowe's and sell them to VIP for about 45 percent of their retail value.
 {¶ 21} Stephen Crone testified that he sold stolen merchandise, mostly Bose stereos, to VIP five to eight times. He would get the sealed, boxed stereos "off the street," and appellant would give him approximately $1,000 per stereo. He never told appellant the items were stolen.
 {¶ 22} Derek Ables testified that he sold stolen items to VIP approximately 50 times. He sold appellant mostly industrial power tools, such as generators and paint sprayers that he had stolen from Home Depot, Lowe's, and others. He said he stole DeWalt power tools from Lowe's and paint sprayers from Home Depot.
 {¶ 23} Michael Melton testified that he sold tools he had stolen to VIP 20 to 30 times. He said he never "flat out" told appellant the items were stolen. Melton testified that appellant should have known he had stolen the items because Melton was young and appellant knew he was not old enough to own all the tools.
 {¶ 24} Sheree Jones, a fraud investigator for the Internet website E-bay, testified that 98 percent of the items appellant listed were described as new in box.
 {¶ 25} Greg Hord, the regional director of loss prevention and safety at Lowe's, testified that the vast majority of the items confiscated from VIP still had the shipping labels with the specific local store indicated on them. Some items were out of their boxes, and he determined they were Lowe's items by checking their serial numbers. All of the approximately 55 items had been deemed either lost or stolen by Columbus Lowe's stores.
 {¶ 26} James Jackson, the court liaison for Big Bear grocery stores, testified that he identified 10 to 15 vacuum cleaners from the items confiscated from VIP as being from Columbus area Big Bear stores based upon their shipping labels. All of the items were in new, sealed boxes. He admitted that some of the items on his list of missing items could have been purchased by employees, although he did not explain why these would not show up as being purchased rather than being deemed unaccounted for. He also testified that Big Bear measures inventory in its stores by the square footage allotted on the shelves and not by the specific number of items, making it difficult to determine when an item has been stolen.
 {¶ 27} Thomas Herbert, the president of Delta Marine, testified that, prior to the search warrant being issued, Detective Schulze called him and told him that two GPS depth range finders were in appellant's pawnshop. He then went and retrieved those items, identifying them by Delta Marine's pricing stickers. As far as the items confiscated by the police from VIP, he said that he sold many like items, although he could not specifically say they were from his store without seeing the pricing stickers.
 {¶ 28} Justin Haas, a salesman for H.H. Gregg, testified that he and another employee from H.H. Gregg identified numerous items from those confiscated from VIP as belonging to local H.H. Gregg stores based upon the serial numbers, model numbers, and shipping labels. He said about 80 percent of the items were still new in box. He could not identify the items as being stolen from a particular store.
 {¶ 29} Anthony Oliveri, a store manager for Best Buy and former loss prevention manager, testified that he identified numerous Best Buy items and the particular store they came from by the shipping labels, which were still intact on most of the unopened boxes. The items included nine Bose stereo systems that he could specifically identify had come from certain Best Buy stores. With regard to some of the Bose stereos, he was also able to look at the individual store records and determine that Bose stereos were unaccounted for.
 {¶ 30} Jason McAtee, a store manager for Home Depot and former loss prevention manager, testified that the store had noticed large losses of unaccounted inventory for Graco paint sprayers, as well as Echo, DeWalt, Hoover, Brasscraft, and Ridgid brand items. He stated that Ridgid, Graco, and Echo are exclusive to Home Depot. He also said the SKUs for the Hoover and Brasscraft items were exclusive to Home Depot. McAtee further testified that after purchasing 126 Echo chain saws for Home Depot, 123 were eventually unaccounted for. He testified that, by matching pawn tickets with Home Depot sales receipts and merchandise serial numbers, he could determine what items were stolen or lost from Home Depot. With regard to the Echo, Ridgid, Graco, Watchdog, Campbell Hausfield, Lincoln, and Fast Track items found in the VIP inventory, he was certain those items had come from Home Depot. Some of these items also bore Home Depot shipping labels and ink stamps. However, with regard to some common-brand items seized, McAtee testified that he could not say that specific item was stolen from Home Depot, though he could show definitive losses of that same item from Home Depot during the relevant times. He admitted on cross-examination that, although he could determine that certain items with serial numbers from VIP had never been logged as being sold at Home Depot, he never witnessed the items actually being stolen.
 {¶ 31} Monica Lichi, a customer service associate for Circuit City, testified that the woman who completed the police report and identified the Circuit City items confiscated from VIP no longer worked for Circuit City. Lichi testified that she had no personal knowledge that the items listed in the police report were stolen.
 {¶ 32} Appellant's argument that the state failed to prove that the items were stolen is based upon two theories: (1) the state never proved that any specific item seized from VIP was actually stolen from any given retail location; and (2) the various witnesses from the retailers indicated that the losses from their stores could be the result of not only theft, but also the result of bad debt, fraudulent credit cards, or bad checks. We find the jury's verdict was not based on insufficient evidence. Construing the evidence and testimony most strongly in favor of the prosecution, the combination of the testimony of those who stole the items and the testimony of the retailers' representatives demonstrates that reasonable minds could reach different conclusions as to whether the items seized were stolen.
 {¶ 33} Mercer testified that she drove Cyrus to VIP perhaps 30 times to sell stolen items, sometimes directly from Home Depot or Delta Marine after he had stolen the items. Cyrus testified that he had been to VIP probably 100 times to sell paint sprayers, chain saws, generators, and tools he had stolen from Home Depot, Delta Marine, and Lowe's. Crone testified that he sold stolen merchandise, mostly Bose stereos, to VIP five to eight times. Ables testified that he sold, on 50 occasions, industrial power tools, such as generators, DeWalt tools, and Home Depot paint sprayers that he had stolen from Home Depot, Lowe's, and others. Melton testified that he sold stolen tools to VIP about 20 to 30 times. Several of the witnesses representing the various retailers indicated that they knew that many of the items from their specific stores found at VIP were certainly stolen because they could find no record of sales of those items using their serial numbers. Other retailers' representatives testified that they could see large losses occurred at certain Columbus stores during the same period the items were stolen.
 {¶ 34} The level of proof appellant demands to demonstrate that each stolen item sold by the thieves to VIP was the same item later confiscated from VIP would be nearly impossible to obtain. The present circumstances do not lend themselves to direct proof that the items confiscated were the same items admittedly stolen and sold to VIP. Rather, due to the extremely high volume of items confiscated and stolen, many of which were the exact same make and model as each other, the present circumstances are the type that must depend upon circumstantial evidence. Clearly, a fact may be proved to a moral certainty by circumstantial evidence as well as direct evidence. State v. Hankerson (1982), 70 Ohio St.2d 87. The circumstantial evidence that the items were stolen was overwhelming. Mercer, Cyrus, Crone, Ables, and Melton admitted that they all sold stolen products of the exact same makes and models seized to VIP. Further, the items seized from VIP were still in their sealed boxes with their original shipping labels from the retailers. In sum, we find there was sufficient evidence, and the trial court did not err in denying appellant's Crim.R. 29 motion.
 {¶ 35} Appellant also argues the state presented insufficient evidence of the value of the stolen property. We disagree. Value, as used in R.C. 2913.51, is determined in accordance with R.C. 2913.61. State v. Massey (Nov. 28, 2000), Franklin App. No. 99AP-1355, citing State v. Corley (Apr. 26, 1999), Stark App. No 1998CA00169. The statute offers examples, without limitation, of the evidence that may be used to establish the value of property in a theft offense. R.C. 2913.61(E). Some evidence of value, albeit minimal, must be presented to the jury to establish value. Id., citing Corley, supra; State v. Fortson (Dec. 22, 1995), Portage App. No. 95-P-0014; State v. Cook (Sept. 8, 1987), Preble App. No. CA87-04-009; State v. Grundstein (1943), 46 Ohio Law Abs. 175.
 {¶ 36} Again, appellant fails to make any specific argument with regard to any of the myriad counts. Our review of the record reveals there was evidence of value with regard to the items contained in each of the counts. For instance, the police reports filed by the retailers included inventory lists that were admitted into evidence. Nearly all of the inventory lists were completed by the same retailer representative who testified in court. The inventory lists indicated the approximate values of many of the items contained in the counts, for example: state's Exhibit 26 listed the specific prices of the vacuum cleaners stolen from Big Bear and contained in Count 90; state's Exhibit 21 listed the price of the GPS equipment stolen from Delta Marine contained in Counts 22 and 23; state's Exhibit 10 listed the specific prices of the various Graco paint sprayers, DeWalt reciprocating saw kit, and Ridgid mitre saw stolen from Home Depot contained in Counts 9, 28, 36, 46, 77, 86, 87, and 110; state's Exhibit 20 listed the specific price of the DeWalt drills stolen from Lowe's contained in Count 115; state's Exhibit 23 listed the specific prices of the Bose stereo and speaker systems, data links, CD writers, Sony camcorder, video cards, DSL router, and EBookman stolen from Best Buy and Circuit City contained in Counts 38, 47, 51, 55, 58, 59, 60, 69, 70, 71, 75, 76, 80, 83, 84, 102, 104, 112, and 118. Further, direct testimony was presented by the retailers' representatives and one of the thieves. McAtee testified the retail value of the Graco paint sprayers was $797 and the value of the Echo lawn equipment was from $199 to $499. Lichi testified that the retail value of the Bose stereo systems was $500 to $1,000. Crone testified that he sold the Bose stereos to VIP for $1,000. Jackson testified that the vacuums from Big Bear cost $200 each. Further, appellant's argument that the witnesses testified as to the value of similar items but not as to the value of the specific items seized from VIP is disingenuous. The retail value of the sealed, new in-box merchandise was the same whether it was in the police warehouse or on the retailers' shelf. The testimony of the retailers' representatives and the figures they used in the police reports detailing the approximate value of the merchandise confiscated from VIP based upon the retail value of merchandise of the same make and model found in their stores was sufficient. We find there was sufficient evidence of the value of the merchandise contained in the indictment, and the trial court did not err in denying appellant's Crim.R. 29 motion in this regard.
 {¶ 37} Appellant also argues that, because the state failed to prove the elements of receiving stolen property, it necessarily follows that it failed to prove the elements of engaging in a pattern of corrupt activity. However, as we have found there was sufficient evidence with regard to receiving stolen property, appellant's argument with regard to engaging in a pattern of corrupt activity must also be rejected. Therefore, appellant's second assignment of error is overruled.
 {¶ 38} Appellant argues in his third assignment of error that the jury's verdict with regard to receiving stolen property and engaging in a pattern of corrupt activity was against the manifest weight of the evidence. Sufficiency of the evidence produced by the state and weight of the evidence adduced at trial are legally distinct issues. While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. Thompkins, supra, at 390. When a defendant asserts that his conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id., citing State v. Martin (1983),20 Ohio App.3d 172, 175. This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 39} With regard to the receiving stolen property counts, appellant contends the state failed to prove that appellant knew or should have known that the merchandise was stolen. Appellant points out that he was under constant police supervision from Detective Schulze, Detective Schulze placed holds on some items and not others, and Detective Schulze personally purchased new in-box items from him. Appellant also testified that he often turned down people attempting to sell stolen items, and he has cooperated with the police in catching thieves who have attempted to sell him stolen merchandise. He also testified that he asked Cyrus where he was getting so many inexpensive paint sprayers, and Cyrus told him he was a contractor for Sherwin Williams. He said he did not think any of the items were stolen because Detective Schulze never told him they were stolen or put them on hold. He said after Cyrus was put on the hotlist, he never bought from Cyrus again and never told Cyrus he was on the hotlist. He also denied ever having told Cyrus to get certain items for him. He also denied that Paula Mercer ever brought in items for Cyrus after Cyrus was put on the hotlist. He said the items Cyrus brought in were so big and heavy, he saw no possible way that they could be stolen because they were too large to sneak out of a store. He also said he assumed that most of the boxed items in retail stores would be in back storerooms and not accessible to customers in the showroom. He also testified that he preferred buying items outright instead of pawning them because the wait time to sell a pawned item is much longer. Further, appellant stated that he asked the undercover police officer who was attempting to sell him a stolen item whether the item was stolen. He said he did not hear the undercover officer say that the item fell off the shelf into his cart because he had his back turned. Appellant also testified that he asked Cyrus several times whether items were stolen, and Cyrus said they were not. He said although it crossed his mind that Cyrus had sold him many paint sprayers, Detective Schulze never told him they were stolen, so he assumed they were not. Appellant also testified that he was not too suspicious of Melton because he would come in with an older man, and all of the tools were used.
 {¶ 40} However, there was also evidence presented indicating that appellant knew or should have known the items were stolen. Melton testified that, because he was young, appellant should have known that he could not own all the used tools he sold to VIP. Cyrus testified that he sold things to VIP about 100 times, and appellant told him he would buy as many paint sprayers as Cyrus could get. Cyrus also testified that, after he went onto the police "hotlist," he would have Paula or Shawn Mercer use their identification to sell the stolen items, or he would bring in somebody off the street to use their identification. He said that appellant informed him he was on the hotlist, but appellant still bought things from him after that someone else's identification. Cyrus said that after Delta Marine came to the store and reclaimed some items he had sold to VIP, appellant told Cyrus that he would have to pay him back for the reclaimed items. So, after each subsequent purchase from Cyrus, appellant would keep some of the money as a payback for the lost Delta Marine merchandise. Ables testified that appellant told him he was on the police hotlist; however, appellant continued to buy merchandise from him even after he was put on the hotlist. Ables said he would just come into VIP with another person and have the other person use his identification.
 {¶ 41} Given there was evidence on appellant's state of mind presented by both appellant and the state, the issue became one of credibility. When this court engages in a manifest weight analysis, we must keep in mind that the trier of fact, in this case the jury, was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v. Gibbs (1999), 134 Ohio App.3d 247, 256. Although appellant's testimony, as well as the testimony of others on his behalf who portrayed appellant as an honest person who is active in the community and church, if believed, could be persuasive, given our standard of review in a manifest weight argument, we simply cannot find that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. This is not an extraordinary case when the evidence presented weighs heavily in favor of the defendant. The jury apparently found the witnesses for the state to be more credible than appellant and his witnesses, and we see no reason to disturb that finding.
 {¶ 42} Appellant also argues that because the state failed to prove with regard to the receiving stolen property counts that he knew or should have known that the merchandise was stolen, it necessarily follows that it failed to prove the elements of engaging in a pattern of corrupt activity. However, as we have found the jury's verdict with regard to the receiving stolen property counts was not against the manifest weight of the evidence, this argument must also be rejected. Therefore, we must deny appellant's third assignment of error.
 {¶ 43} Appellant argues in his fourth assignment of error that the prosecuting attorney's remarks during trial and closing arguments constituted prosecutorial misconduct. The test for prosecutorial misconduct is whether the remarks made by the prosecution were improper and, if so, whether they prejudicially affected substantial rights of the accused. State v. Smith (1984), 14 Ohio St.3d 13, 14. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940. An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. State v. LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128, at ¶121. At trial, appellant's counsel failed to object to the prosecutor's comments that he now assigns as error. Failure to object to alleged prosecutorial misconduct waives all but plain error. Id. at ¶ 126. Thus, in order to reverse the conviction for prosecutorial misconduct, we must be persuaded that the defendant would not have been convicted but for the alleged misconduct. See State v. Slagle (1992), 65 Ohio St.3d 597,604-605.
 {¶ 44} Appellant first argues that the following questioning of Hord by the prosecutor was improper:
 {¶ 45} "Q. You sat through the testimony of Mr. Ables?
 {¶ 46} "A. I did. I would like to say I'm not here as part of a plea agreement, for the record.
 {¶ 47} "Q. What did you think of that testimony, sir?
 {¶ 48} "A. It's a little bit disheartening, quite honestly. Having done this profession for the better part of 15 years, and measuring our success or failures as a company, my aspect of the company based on the dollars that we lose, it's frustrating there are people like the last witness and many others like him that they make their living the way they do."
 {¶ 49} Appellant argues that it is improper for a prosecutor to ask a witness to give an opinion of another witness's credibility. However, the prosecutor was not asking Hord about Ables's credibility, and Hord did not give any opinion of Ables's credibility. Rather, the prosecutor was asking Hord to comment on the apparent ease with which Ables stole items from Lowe's and Ables's ability to make a living by stealing from retailers, given Hord's position as director of loss prevention at Lowe's. Hord's response that Ables's testimony was "disheartening" was not related to Ables's credibility or trustworthiness, and we see no prejudice. This argument is without merit.
 {¶ 50} Appellant next argues that, during the prosecutor's closing argument, the prosecutor impermissibly offered his own opinion when he stated:
 {¶ 51} "* * * I bet that property view and that notebook right there are more than enough to convince you people of reasonable intelligence, like me, that something is not just right here. * * *"
 {¶ 52} Prosecutors are granted wide latitude in closing arguments. State v. Rahman (1986), 23 Ohio St.3d 146, 154. However, a prosecutor should not express personal opinions as to the credibility of a witness, nor should the prosecutor argue facts not in evidence. State v. Liberatore (1982), 69 Ohio St.2d 583; State v. Daugherty (1987),41 Ohio App.3d 91. In the present case, the prosecutor's use of "I bet" did not indicate an expression of his personal opinion. See State v. Stiggers (Apr. 15, 1998), Summit App. No. 18405 (prosecutor's statement, "That's where you got the marijuana from, and I bet that's your motive for this whole robbery," was supported by the evidence submitted and did not express a personal opinion). The remainder of the prosecutor's statement related to evidence presented at trial, specifically, the property view and the notebook. Thus, the statement was supported by evidence admitted at trial and did not express the prosecutor's personal opinion. This argument is without merit.
 {¶ 53} Appellant next argues that, during the prosecutor's closing argument, the prosecutor made the following remarks that were not supported by evidence brought forth during trial:
 {¶ 54} "Make no mistake about it, the VIP pawn shop was a fencing operation. It supported drug dealers. Let me back up. It did not support drug dealers per se. It supported drug users and it supported thieves."
 {¶ 55} During summation, a prosecutor has wide latitude in stating what the evidence shows, the reasonable inferences that may be drawn from it, and may comment on those inferences during closing argument. State v. Smith (1997), 80 Ohio St.3d 89, 111. However, that latitude does not "encompass inviting the jury to reach its decision on matters outside the evidence adduced at trial." State v. Hart (1994), 94 Ohio App.3d 665,672. In the present case, the above statement was based upon the evidence presented at trial, though the statement was not artfully articulated initially. Mercer testified that she did drugs with Barry and Shawn Mercer, and she stated that, after Cyrus would sell the stolen merchandise to VIP, they would use the cash to buy drugs. Cyrus also testified that he would use the money he made from VIP for gambling and drugs. Thus, there clearly was evidence that the money earned by Cyrus and Mercer from selling stolen goods to VIP supported their drug use. We also note that the prosecutor, realizing that his statement could be misconstrued by the jury to imply that appellant was directly involved with drug dealers or drug use, immediately and emphatically clarified his above statement by explaining:
 {¶ 56} "* * * It gave them an opportunity to make a living in this community. It is a fencing operation. There is no connection in any way, shape or form or my intent to mention that there is any connection with either of these two defendants and drug sales or drug use.
 {¶ 57} "There is none, and I didn't mean to say it that way, but their actions as a fencing operation supported people in the community, as you saw testify, Barry Cyrus, Paula Mercer, and you saw them. They admitted drug use. They got their money just like many other people in this community, through the fencing operations that took place at VIP pawn shop."
 {¶ 58} Thus, although the prosecutor's initial statement was not carefully worded, he realized such and quickly clarified what he meant. This clarification coupled with the fact there was evidence that the cash made by selling stolen goods to VIP was used to support drug use, we find no error, much less plain error, in the prosecutor's statement. This argument is without merit.
 {¶ 59} Appellant next argues the prosecutor again improperly offered his own opinion regarding the case during this portion of his closing argument:
 {¶ 60} "* * * I believe it has been my case all along, and I think I signed each and every one of those plea agreements. A couple of them got the best of me, but I executed those plea agreements so that they would testify because I believe that if you cut off the head, the rest of it will fall apart, and that is what this trial is all about."
 {¶ 61} We do not find the mere use of "I believe" and "I think" necessarily amounts to an expression of personal opinion. In the above statement, reading the first two uses of those phrases in their context, in no way were they used to express the prosecutor's personal opinion of the case or evidence. As for the final use of "I believe," "[t]his is a technical argument at best." State v. Walker, Hamilton App. No. C-010515, 2002-Ohio-3535, at ¶ 15. As the court explained in Walker, "[w]hile the prosecutor may not state a personal belief, every time the pronoun `I' is used is not a violation — e.g., * * * `I believe, when all the evidence is in, you will * * *.' While a stretch might be made that the prosecutor's statement here was improper, we do not make that stretch. A reasonable jury would not have concluded from the statement that the prosecutor was injecting his personal opinion into the argument." Id. Likewise, in the present case, the prosecutor's use of the phrase "I believe," when read in context, did not inject the prosecutor's personal opinion on inadmissible evidence or improperly upon a witness in this case, and certainly did not rise to the level of plain error or result in any prejudice. This argument is without merit.
 {¶ 62} Appellant next argues the prosecutor again offered his own opinion of the case and appellant during this portion of his closing argument:
 {¶ 63} "* * * But I also have no doubt that Mr. Loch does repeated business with Barry Cyrus, with Paula Mercer, and with Derek Ables, and he brought in a pastor or a lay minister, a very fine character witness, but Mr. Loch, to go back to my religion as a kid, he is robbing Peter to pay Paul. * * *"
 {¶ 64} As for the statement regarding Cyrus, Mercer, and Ables, this statement was supported by the evidence at trial. The testimony of Mercer, Ables, and Cyrus indicated that they together executed approximately 200 transactions with appellant, undoubtedly qualifying as "repeated business." With regard to the statement relating to the pastor, it is true that a prosecutor should not express personal opinions as to the credibility of a witness. Liberatore; Daugherty, supra. However, even if it were improper for the prosecutor to comment upon the credibility of the pastor, certainly no prejudice could have resulted, given the prosecutor agreed that appellant's witness, the pastor, was a "very fine" character witness, thereby bolstering his credibility. Therefore, this argument is without merit.
 {¶ 65} Appellant next argues that the prosecutor encouraged the jury to convict appellant in order to protect their community by concluding his closing argument by stating:
 {¶ 66} "Ladies and gentlemen, this operation is a blight on our community. It is a blight. Consider that, and thank you for your time."
 {¶ 67} Prosecutors should not appeal to public sentiment in closing arguments by urging the jurors to protect society, protect community values, preserve civil order, or deter future lawbreaking. See State v. Spirko (1991), 59 Ohio St.3d 1, 13; State v. Hart (Mar. 14, 2002), Cuyahoga App. No. 79564. Although we do find this statement to approach the border of impropriety, we conclude that such statement was sufficiently dissimilar to the one in Hart, supra, in which the prosecutor invited the jury to evaluate the fairness of the judicial system as a whole instead of evaluating the guilt or innocence of appellant. In contrast, in the present case, the prosecutor's plea related directly to the guilt of this particular appellant and his engagement in a corrupt activity and receiving stolen property. In reading the comment in its entire context, it did not urge the jury to convict appellant based upon any evidence outside the record or for reasons related to the community at large without regard to this appellant's particular activities. However, even if we were to find this comment improper, we conclude the comment was not prejudicial because appellant would have been convicted even in its absence. State v. Tumbleson (1995),105 Ohio App.3d 693, 700. We cannot say that the outcome of the trial would not have been different without this statement. Therefore, this argument is without merit.
 {¶ 68} Appellant also argues that, when viewed cumulatively, these comments by the prosecutor denied him a fair trial, citing our case in State v. Willard (2001), 144 Ohio App.3d 767, 776. This court held in Willard that, although when viewed alone, any single remark may not be enough to require reversal, the cumulative effect of a prosecutor's improper statements may deny a defendant a fair trial. Id. As we have found the above comments were not improper, we find their cumulative effect did not deny appellant of a fair trial. For the foregoing reasons, appellant's fourth assignment of error is overruled.
 {¶ 69} Appellant argues in his fifth assignment of error that the failures of his trial counsel constituted ineffective assistance of counsel. To decide appellant's claim of ineffective assistance of counsel, we must apply the two-tier test of Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. First, appellant must show that counsel's actions were outside the wide range of professionally competent assistance. Second, appellant must show that he was prejudiced as a result of counsel's actions. Id. at 689. Prejudice will not be found unless appellant demonstrates there is a reasonable possibility that, if not for counsel's errors, the result of the trial would have been different. State v. Bradley (1989), 42 Ohio St.3d 136, 143. A strong presumption exists that licensed attorneys are competent and that the challenged action is the product of a sound trial strategy and falls within the wide range of professional assistance. Id. at 142.
 {¶ 70} Appellant argues that his trial counsel failed to object to several instances of prosecutorial misconduct, to blatant hearsay in the search warrant and affidavit offered by the state, and to numerous improper questions of the witnesses. As to the arguments relating to assignments of error one and four, as we have found no error in those assignments of error, we also find appellant was not given ineffective assistance of counsel in those instances.
 {¶ 71} Appellant also presents several other instances of alleged ineffective assistance of counsel. He first asserts that his counsel should not have asked Detective Schulze on cross-examination why he became suspicious of appellant, which allowed the detective to respond that appellant was dealing with known criminals. Appellant reasons that reasonable strategy would include every attempt to keep this information from the jury. However, this information had already been revealed by Detective Schulze on direct examination. Therefore, we can find no prejudicial effect from trial counsel's question. Appellant also asserts that his trial counsel should have objected to Ables's testimony that appellant was "probably selling items on E-bay." However, trial counsel for appellant's co-defendant did object to this comment, and the trial court sustained the objection. Thus, any objection by appellant's counsel was unnecessary. Appellant also contends that his trial counsel permitted McAtee to testify that Home Depot had a price increase in DeWalt tools due to the high amount of loss in Columbus. Appellant fails to indicate upon what specific evidentiary rule and theory such an objection would have been made. Appellant also fails to indicate how the inference that his conduct caused the price increases was prejudicial to him. Therefore, these arguments are without merit, and appellant's fifth assignment of error is overruled.
 {¶ 72} Appellant argues in his sixth assignment of error the trial court abused its discretion in imposing consecutive sentences without making the requisite findings for such pursuant to R.C. 2929.14 and2929.19(B)(2)(c). In order to impose consecutive sentences when an offender is convicted of multiple offenses, a trial court must first find consecutive service is necessary to protect the public from future crime or to punish the offender. R.C. 2929.14(E)(4). The court must also find consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Id. Finally, the trial court must find one or more of the following: (a) the offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17 or 2929.18 of the Revised Code, or was under post-release control for a prior offense; (b) the harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct; or (c) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. Id. If a trial court imposes consecutive sentences, the trial court must give its reasons for imposing the given sentence. R.C.2929.19(B)(2)(c). When imposing consecutive sentences, a trial court is required to make its statutorily enumerated findings and give reasons supporting those findings at the sentencing hearing. State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165, paragraph one of the syllabus.
 {¶ 73} In the present case, the trial court made the proper findings and gave reasons supporting those findings at the sentencing hearing. At the sentencing hearing, the trial court found that consecutive sentences were necessary to protect the public and punish the offender, the terms imposed were not disproportionate to the conduct and to the danger the offender poses and that the harm is so great or unusual that a single term does not adequately reflect the seriousness of the conduct. During the sentencing hearing, the trial court stated that the evidence showed an operation of a criminal enterprise that netted over $900,000 on property sold on E-bay; an enormous mass of items went through the pawnshop; there were hundreds of thousands of dollars worth of stolen goods in the pawnshop when the search warrant was executed; thieves used his shop as a warehouse; appellant attempted to complete transactions without Detective Schulze present, demonstrating he knew the goods were stolen; local merchants suffered extensive financial loss; numerous types of warnings indicating that the property was stolen; appellant encouraged, participated in, and benefited by the criminal enterprise; the combined value of E-bay items sold and the collection of goods seized at the time of the search warrant had a retail value of almost $2.5 million; appellant basically had a fencing operation that operated for a substantial period and would have continued absent his arrest; the community suffered from appellant's actions; retailers suffered from appellant's actions; and appellant showed no remorse and blamed the police for allowing everything to occur.
 {¶ 74} Our review of the transcript of the sentencing hearing demonstrates the trial court found that imposing consecutive sentences was necessary to protect the public and punish the offender, the terms imposed were not disproportionate to the conduct and to the danger the offender poses, and the harm was so great or unusual that a single term does not adequately reflect the seriousness of the conduct. The trial court gave a bevy of reasons to support its findings. Therefore, we find the record clearly establishes that the trial court made the required statutory findings, pursuant to R.C. 2929.14(E)(4), and has further complied with the standards set forth in R.C. 2929.19(B)(2)(c). Since we cannot find by clear and convincing evidence that the record failed to support the trial court's findings, this court affirms appellant's sentence, and appellant's sixth assignment of error is overruled. See R.C. 2953.08(G).
 {¶ 75} Accordingly, we overrule appellant's six assignments of error, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
LAZARUS, J., concurs.
BRYANT, J., concurs separately.